## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ESTATE OF RONALD R. HALE, by its executrix, ROSE HALE, ) ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 07-40251-FDS |
| v. ) ) | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, ) ) ) | |
| Defendant. ) ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil action arising out of a claim by the estate of Ronald Hale for accidental death benefits from defendant Prudential Insurance Company of America. The matter arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.[1]

On July 23, 2006, Hale died while bicycling. Prudential is the issuer of a group life insurance policy that Hale obtained through his employment and under which he was covered at the time of his death. Prudential paid the basic death benefit of $50,000, but has not paid an additional $50,000 accidental death benefit to which plaintiff's estate contends it is entitled. The central issue presented is whether plaintiff made a proper claim for the accidental death benefits.

Defendant Prudential has moved for summary judgment, contending that plaintiff did not

---

[1] Although the complaint does not state specifically, it appears that this is a suit to recover benefits under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(1)(B).

file a claim for accidental benefits and that it is now too late to do so. For the reasons stated below, the motion will be denied.

I.  **Background**

Except where noted, all facts are presented in the light most favorable to plaintiff.

    A.  **The Death of Ronald Hale**

Ronald Hale was a 56-year-old forge operator at Wyman-Gordon Company. He historically had suffered from cardiovascular problems, and had undergone a coronary procedure involving insertion of a stent.

On July 23, 2006, Hale and two friends, Robert J. DiGiacco and Joseph Sama, set out for a bicycle ride. After they had been riding for roughly two and one half hours, Sama separated from the others so that he could bypass two steep hills. Hale and DiGiacco continued together.

When Hale and DiGiacco reached Grove Street in the town of Paxton, DiGiacco lagged behind, losing sight of Hale briefly. After DiGiacco came around a curve, he discovered Hale lying in the road next to a parked Jeep Cherokee with a smashed rear window. Hale was moaning and attempting unsuccessfully to prop himself up onto his right elbow. His helmet was on without any obvious damage. DiGiacco—who was a physician trained as a neurologist—immediately evaluated Hale's condition.[2]

Gradually, Hale stopped moaning. He lay back and began to have increasingly labored

---

[2] According to DiGiacco, there was no major external bleeding and no bone deformities were apparent. Hale's eyes were open but did not fixate on a visual target. His left pupil appeared larger than his right. His chest appeared to move symmetrically with respiration. A superficial laceration/abrasion ran vertically along the right mid-clavicular line from just above the clavicle inferiorily onto the chest to the level of his nipple. There were no apparent fractures or crepitus upon palpation. He was not clutching his chest or tachypneic. He had carotid and radial artery pulses.

breathing.  DiGiacco performed a jaw lift to maintain an airway, which helped for a time, but Hale continued to deteriorate.  DiGiacco then initiated CPR, which he continued until the arrival of emergency medical services personnel and police.

Ultimately, the EMS team took over the CPR and continued rescue efforts.  Hale was eventually transferred to an ambulance and transported to the emergency room.  Resuscitation attempts at the hospital were unsuccessful.

### B. Cause of Death

The cause of Hale's death is a matter of disputed fact.  As reported on the death certificate, Hale died of coronary artery atherosclerosis, not from a collision with the Jeep.[3]

Dr. DiGiacco disagrees with the medical examiner's conclusions, and contends that Hale's death was an accident.  After Hale was evacuated in the ambulance, DiGiacco observed the damage to the Jeep and noted a relative lack of damage to the bicycle.  He also noted an absence of skid marks.  Paxton Chief of Police Robert Desrosiers, who performed an accident reconstruction, noted the same:

> Pavement prior to the point of impact also failed to yield evidence of brake lock.
> Both front and rear brakes were properly adjusted and did lock the wheels upon
> testing.  I locked the rear wheel and skidded it on asphalt adjacent to the crash
> scene.  Both the tire and asphalt indicated clear evidence of lock up.

(M.V. Crash Police Rpt. attached to Pitnof Aff.).

DiGiacco believes that the crash resulted from a momentary lapse in Hale's attention to the road, not a cardiac event.  Chief Desrosiers concluded as follows:

---

[3] Where the form requires an indication of the approximate interval between onset of the condition and the resulting death, the medical examiner wrote "years."  Consistent with that, the examination listed an "old myocardial infarction" as a contributing condition to Hale's death.  For "Manner of Death," the medical examiner checked "natural," not "accident."

3

> If in fact Ronald suffered a myocardial infarction prior to impact, it would have occurred instantly otherwise I would expect variation in course, a slower collision and I would not expect his head and torso to have been upright. A second theory and in my opinion, the most likely, is that Ronald suffered his infarction post impact, brought on by blunt trauma.

(*Id.*). DiGiacco also contends that while Hale was lying on the road, fluid was probably collecting around his heart and slowly interfering with adequate expansion and filling of cardiac chambers and compression of the coronary arteries. This, according to DiGiacco, was the likely cause of localized cardiac ischemia and infarction.

### C. The Insurance Policy

Hale was covered by a group life and accidental death and dismemberment policy issued by Prudential through his employment at Wyman-Gordon. Wyman-Gordon is the plan administrator.

The Group Insurance Certificate Booklet provided to employees includes a section entitled "WHEN YOU HAVE A CLAIM." That section provides as follows: "Each time a claim is made, it should be made without delay. Use a claim form, and follow the instructions on the form. If you do not have a claim form, contact your Employer." (Group Ins. Cert. Bklt. at 7). Under the "CLAIM RULES" section, the certificate of coverage Booklet further provides:

> Proof of Loss: Prudential must be given written proof of the loss for which claim is made under the Coverage. This proof must cover the occurrence, character and extent of that loss. It must be furnished within 90 days after the date of the loss. . . . A claim will not be considered and valid unless the proof is furnished within these time limits. However, if it is not possible to give proof within 90 days, it must be given no later than one year after the time proof is otherwise required, except in the absence of legal capacity.

(*Id.* at 26).

Prudential has published a "Group Life Insurance Claim Form," a copy of which was

provided to Hale's widow after his death.  The Claim Form instructs the claimant as follows: "Use for employee/member and dependent death claims" and "Please send the completed form and all attachments" to Prudential's Group Life Claim Division in Philadelphia.  The instructions to the form also provide that "If an accidental death claim is being filed, attach supporting information, such as a police report or newspaper clippings."[4]

Under the Claim Procedures described in the Summary Plan Description that Prudential provided along with the Group Insurance Certificate, "Prudential shall notify [the claimant] of the claim determination within 45 days of the receipt of [the] claim."  (Group Ins. Cert. Bklt. at 30). If the claim is denied, in whole or in part, Prudential will send a written notice of the denial.  The plan description provides as follows:

> The notice will be written in a manner calculated to be understood by you and shall include:
> (a) the specific reason(s) for the denial,
> (b) references to the specific plan provisions on which the benefit determination was based,
> (c) a description of any additional material or information necessary for you to perfect a claim and an explanation of why such information is necessary, [and]
> (d) a description of Prudential's appeals procedures and applicable time limits, including a statement of your right to bring a civil action under section 502(a) of ERISA following your appeals . . . .

(*Id.* at 30-31).  In the event that the claimant does "not receive a response" to the claim within the appropriate time frame, the Summary Plan Description states that the claim for benefits will be deemed to have been denied.  In such cases, the claimant has the right to appeal the (deemed) denial to Prudential in writing within 180 days.  (*Id.* at 31).

---

[4] Victoria Angle, a Senior Technical Examiner for Prudential, submitted an affidavit stating that "Accidental death benefit claims filed under the Group Contract must be submitted to Wyman-Gordon before Prudential can act on them."  That statement appears to be contradicted by the plan documents, which require that proof of claim be made to Prudential.

5

### D.     The Accidental Death Benefit Claim

Plaintiff's counsel Nathaniel D. Pitnof contends that he sent Wyman-Gordon (not Prudential) a package containing a completed Prudential claim form with supporting documentation at some unspecified date between July 23 (the date of Hale's death) and November 1, 2006.[5]  That documentation included a certified copy of the death certificate; Dr. DiGiacco's report and diagnosis; and a copy of the police report accident reconstruction.  There is no copy of any such package in the record.

At some later point, Rose Hale, Hale's widow and the executor of his estate, informed Pitnof that Wyman-Gordon's benefits department had not received any materials.  On November 1, 2006, Pitnoff "resent the same package, using copies in [his] file, and updated the date on the covering letter."  (Pitnof Aff. ¶ 5).  A copy of that package is included in the record; it includes a Prudential claim form, the death certificate, Dr. DiGiacco's report, and the police report.  Although Pitnof contends that he resent the "same" package, the November 1 letter was not addressed to Wyman-Gordon; instead, it was addressed to Prudential Life Insurance Company's Group Life Claims Division in Philadelphia.

Pitnof's cover letter of November 1 is captioned "ACCIDENTAL DEATH BENEFIT - CLAIM OF RONALD R. HALE" in all capital and bold letters.  The body of the letter states, among other things, that Mrs. Hale "is seeking the accidental death benefit that the policy provides."

Although Pitnoff submitted a Prudential claim form, he did not complete the portion of the

---

[5] Pitnof does not indicate when he sent the package.  His affidavit states only that "[w]ithin a month or so after the death of Ronald Hale, Mrs. Rose Hale came to my office," that they discussed the claim, and that "in the normal course" he sent the claim package to Wyman-Gordon.

form that applies to accidental death benefit coverage. Part 4 of the Claim Form directs the claimant to "Complete only the coverage(s) that apply to this claim." The form then provides a series of checkboxes alongside a list of types of coverage, followed by blanks where the claimant can fill in the "Control Number," "Amount," "Effective Date of Coverage," and "Branch" of the applicable coverage. There are no marks in any of the checkboxes on the form. Instead, Pitnof only filled in the control number, effective date of coverage, and branch for the Basic Term Life coverage (leaving the space for amount blank). The rest of the section was left blank; in particular, Pitnof did not complete any part of the section relating to Accidental Death coverage.

Prudential paid the Basic Term Life benefit of $50,000 to Mrs. Hale. The date it paid that benefit is not set forth in the record. There is no evidence that any claim for benefits was ever submitted to Prudential or Wyman-Gordon other than the claim (or claims) submitted by Pitnof.

### E. Litigation and Subsequent Developments

On June 4, 2007, plaintiff filed an action in state court seeking recovery of the $50,000 accidental death benefit. Defendant removed the action to this Court, which ordered a pre-trial schedule that called for the parties to submit the proposed administrative record by March 5, 2008.

On February 14, 2008, Carissa Prosnitz, a paralegal for the defense, sent Pitnof the following e-mail: "Please inform Ed[ward O'Leary, defense counsel] or me whether the Plaintiff has submitted a claim for the AD&D benefit through Wyman & Gordon Co. If you have, it would be greatly appreciated if you would forward those documents to us via facsimile or email." (Prosnitz Decl. at Ex. A). That same day, Pitnof responded as follows: "Thanks for the reminder. I'll send it today, fax you a copy." (Prosnitz Decl. at Ex. B). On March 6, 2008,

defendant moved the Court for an extension of time to file the administrative record, representing that "Prudential is waiting for the plaintiff to submit a formal accidental death claim with the Wyman-Gordon Plan" and that "[s]uch a claim and a final claim decision by the Plan on that claim is necessary to complete the Administrative Record."  The following day, March 7, the Court granted the requested extension.  That same day, Prosnitz sent Pitnof another e-mail outlining a new pre-trial schedule and repeating the request to file a formal claim:  "Please file with the Wyman Gordon Plan as soon as possible the formal Accidental Death claim, so that a decision can be made, both of which are necessary for filing a completed Administrative Record.  Please forward a copy to our office via mail or fax."  (Prosnitz Decl. at Ex. C).  There is no evidence of any response by Pitnof.

Defendant moved for summary judgment on May 5, 2008.

**II.**    **Analysis**

    **A.**    **Standard of Review**

"In an ERISA benefit denial case . . . the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002).  That determination is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Here, however, there is no administrative determination or denial of benefits for the Court to evaluate.  Accordingly, the normal Rule 56(c) standard will apply to this motion.  *See Kosswig*

*v. Timken Co.*, 2007 U.S. Dist. LEXIS 58718, at *11-*12 (D. Conn. Aug. 7, 2007) (applying the "normal standard of review" under Rule 56(c) where defendants "did not deny any claim for benefits" because plaintiffs "failed to ever apply for them"). Under Rule 56(c), summary judgment is appropriate where the record, construed in the light most favorable to the nonmovants, discloses no genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Fidelity & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 6 (1st Cir. 2008) (internal quotations and citations omitted).

### B.   Exhaustion of Remedies

Prudential advances a two-pronged argument: first, that plaintiff failed to exhaust administrative remedies prior to filing suit because it did not file a claim for the accidental death benefit; and second, that any attempt by plaintiff to make such a claim now would be barred by the plan's 15-month contractual limitations period. Because the Court concludes that plaintiff has filed a claim for accidental death benefits, it does not reach the second question.

In ERISA cases generally, "a claimant must have exhausted the plan's administrative remedies before bringing suit to recover benefits." *Terry v. Bayer Corp.*, 145 F.3d 28 (1st Cir. 1998); *Walsh v. Life Ins. Co. of N. Am.*, 2007 U.S. Dist. LEXIS 59417, at *6 (D. Mass. Aug. 15, 2007) ("Although there is no explicit exhaustion requirement in ERISA, it is well established that before petitioning the courts a claimant must exhaust all administrative remedies."). Ordinarily, this requires claimants to pursue remedies available under the plan, including any appeal to the plan administrator, before seeking relief in court.

Failure to submit a claim at all is normally a failure to exhaust administrative remedies. *See Madera v. Marsh USA, Inc.*, 426 F.3d 56 (1st Cir. 2005); *Medina v. Anthem Life Ins. Co.*,

983 F.2d 29, 33 (5th Cir. 1993) ("[Claimant] may not make her first claim . . . in this lawsuit but must follow proper procedures in filing a claim . . . . Since she has not exhausted her administrative remedies, the magistrate judge correctly dismissed her complaint."); *Walsh*, 2007 U.S. Dist. LEXIS 59417, at *11-*12 ("Because Walsh failed to file a claim for LTD benefits, she thus failed to exhaust administrative remedies.").

According to Prudential, the problem is not that plaintiff submitted a defective claim; it is that plaintiff never submitted any claim at all. The Court must therefore ascertain whether the package sent by Pitnof constitutes a "claim" within the meaning of the policy. It must also ascertain whether that package, even if it constitutes a form of "claim," was submitted untimely. The Court will first consider the latter question.

As noted, Hale died on July 23, 2006. The policy provides that "written proof of the loss for which claim is made under the Coverage" must be furnished "within 90 days after the date of the loss," unless "it is not possible" to do so, in which case "it must be given no later than one year after the time proof is otherwise required." The 90-day deadline, if it applies, fell on October 21, 2006. Pitnof sent the package that appears in the record on November 1, 2006, outside of the 90-day period. It is, of course, disputed whether Pitnof ever sent the first package.

For purposes of summary judgment, the Court need not resolve whether Pitnof sent the package once or twice. It is undisputed that Prudential paid the basic life benefit in this case, and that the policy required submission of a claim as a prerequisite to payment of any benefit. It is likewise undisputed that no claim was ever submitted to Prudential other than the Pitnof claim(s). Thus, two scenarios are plausible: either (1) Prudential received the "first" Pitnof submission within the 90-day period, or (2) Prudential received the "second" Pitnof submission after

10

November 1, and paid a benefit pursuant to that submission notwithstanding the elapse of more than 90 days. Thus, either (1) the Pitnof submission was timely, or (2) the Pitnof submission was accepted by Prudential even though it was not.[6] Thus, under any view of the undisputed facts, Pitnof's submission is not time-barred.

The question then becomes whether that submission qualified as a "claim" under the policy. The ERISA statute itself does not define the term "claim." According to the DOL regulations promulgated pursuant to ERISA, "a claim for benefits is a request for a plan benefit or benefits made by a claimant in accordance with a plan's reasonable procedure for filing benefit claims." 29 C.F.R. § 2560.503-1.

The proper focus therefore becomes the plan's procedure. "A federal common law of rights and obligations governs the interpretation of an ERISA-regulated group insurance plan. . . . Thus, straightforward language in an ERISA-regulated insurance policy should be given its natural meaning. Similarly, in keeping with the rule of *contra proferentum*, ambiguous terms should be strictly construed against the insurer." *Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264, 268 (1st Cir. 1994) (internal quotation, citation, and original textual alteration omitted); *see also Nash v. Trustees of Boston Univ.*, 946 F.2d 960, 964 (1st Cir. 1991) (discussing the "federal common law contract principles Congress left to judicial development" under ERISA).[7] Guided

---

[6] More specifically, there are three plausible outcomes under the present state of the record: (1) the Pitnof package was submitted within 90 days; (2) it was submitted after 90 days, but Prudential accepted that an earlier submission was not "possible"; or (3) it was submitted after 90 days, but Prudential paid the benefit anyway, thereby waiving the 90-day limitations period.

[7] *See also Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007) ("In interpreting an ERISA plan, we examine the plan documents as a whole and, if unambiguous, construe them as a matter of law. . . . [W]e consider the common and ordinary meaning as a reasonable person in the position of the plan participant.") (internal quotations, citations, and textual alterations in original omitted); *High v. E-Systems, Inc.*, 459 F.3d 573, 578-79 (5th Cir. 2006) ("[E]ligibility for benefits under an ERISA plan is first governed by the plain meaning of

by the plan documents submitted, the Court must attempt to discern what the parties intended to constitute a claim, bearing in mind that any ambiguities are to be construed against the drafter—here, Prudential.[8]

The Group Insurance Certificate Booklet instructs participants and plan beneficiaries what to do "WHEN YOU HAVE A CLAIM." That section provides that "Each time a claim is made, it should be made without delay. Use a claim form, and follow the instructions on the form." The certificate does not define what is meant by a "claim" beyond use of the designated form and following the instructions. Furthermore, the booklet explains the claims procedure rather functionally as simply a requirement to submit proof of loss: "Proof of Loss: Prudential must be given written proof of the loss for which claim is made under the Coverage. This proof must cover the occurrence, character and extent of that loss." (Group Ins. Cert. Bklt. at 26).

Judged on these minimal criteria, plaintiff did in fact make a claim. Pitnof used the proper form for an accidental death claim and followed most, although not all, of the instructions, including the instruction to attach supporting information. Failure to follow all of the instructions, specifically the failure to complete the "Accidental Death" checkbox section, only makes the claim incomplete. It does not negate its status as a claim. *Cf. Isaacs v. Metropolitan Life Ins. Co.*, 281 Fed. Appx. 240 (4th Cir. 2008), *petition for cert. filed*, (U.S. Sept. 25, 2008) (No. 08-393) (finding claim insufficient to put insurer on notice of intent to claim both short-term and long-term

---

the language of the contract. Only when the plan terms remain ambiguous after applying ordinary principles of contract interpretation does this court apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured.") (internal citation omitted).

[8] Because this case does not strictly speaking involve a "denial of benefits," the *Firestone* standard of review that might grant deference to the plan administrator's interpretation is not implicated. 489 U.S. at 115.

12

benefits).⁹

Two consequences follow. First, Prudential should have recognized Pitnof's submission for what it was—a defective attempt to claim accidental death benefits—and issued a denial. Had Prudential taken this route, it would have been required to provide plaintiff instructions on how to perfect the claim. *See* 29 C.F.R. § 2560.503-1(g)(1) ("The notification shall set forth, in a manner calculated to be understood by the claimant – (i) The specific reason or reasons for the adverse determination; . . . [and] (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."); Group Ins. Cert. Bklt. at 30-31. Second, Prudential's failure to respond to the claim effectively defeats its failure-to-exhaust argument. Instead, plaintiff is deemed to have exhausted its remedies.¹⁰ By regulation, Hale's estate would be "entitled to pursue any available remedies

---

⁹ That conclusion is not undermined by the equivocal e-mail communications between Prosnitz and Pitnof after the initiation of litigation. Defendant contends that in this exchange, "plaintiff expressly indicated that she had *not filed* an accidental death claim with Wyman-Gordon, and that she expected to do so *that day*." (Def. Reply at 3). This is a mischaracterization of the e-mail exchange. In her first e-mail, Prosnitz tells Pitnof that he should inform defense counsel whether he has submitted a claim for the accidental death benefit through Wyman-Gordon and that if he has already done so, "it would be greatly appreciated if you would forward those documents to us via facsimile or email." Just over an hour later Pitnof responds via e-mail: "Thanks for the reminder. I'll send it today, fax you a copy." Pitnof's response is obviously ambiguous. While it is possible that he means to say that he has not yet submitted a claim to Wyman-Gordon but will do so, it could also easily mean that he thinks he has already filed such a claim and will fax defense counsel a copy. For purposes of this motion, the Court accepts the latter alternative as the view of the evidence that is most favorable to the non-moving party.

¹⁰ Although Prudential intended the disclosures in its Summary Plan Description to comply with the Department of Labor regulations (Group Ins. Cert. Bklt. at 29), those regulations no longer treat an insurer's failure to respond to a claim as a deemed denial. Instead, the claimant is now deemed to have exhausted administrative remedies. *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 236 n.7 (1st Cir. 2006) ("In 2000, the ERISA regulations were revised, and the language about claims being 'deemed denied' was deleted. *Compare* 29 C.F.R. § 2560.503-1(e)(2), (h)(4) (2000) (providing that if an ERISA plan does not make a decision within ERISA's time limits 'the claim shall be deemed denied'), *with* 29 C.F.R. § 2560.503-1(l) (2006) (providing that if a plan fails to follow ERISA's procedural requirements, including its time limits, 'a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim').").

under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503-1(l).

### C.   Determination of Plaintiff's Claim on the Merits

If, indeed, plaintiff is deemed to have exhausted its remedies, its claim for benefits is arguably ripe for judicial determination. This Court, however, declines to resolve that dispute at this time.

First, there is potentially essential information missing from Pitnof's submission. The plan administrator and insurer are in the best position to advise plaintiff how to overcome these deficiencies in order to perfect the claim. Furthermore, and more fundamentally, neither the plan administrator nor the insurer has ever considered the merits of the accidental death claim. "One of the policies underlying the exhaustion requirement was Congress's desire that ERISA trustees, not federal courts, be responsible for their actions so that not every ERISA action becomes a federal case." *Medina*, 983 F.2d at 33. Having the plan administrator and insurer make the benefits determination best comports with Congressional policy.

Accordingly, the Court will remand the action to the plan administrator for action on the plaintiff's submission consistent with this opinion.

### IV.   Conclusion

For the foregoing reasons, defendant's motion for summary judgment is DENIED. The case is remanded to the plan administrator for further action consistent with this opinion.

**So Ordered.**

/s/ F. Dennis Saylor

|  |  |
|---|---|
| Dated: December 5, 2008 | F. Dennis Saylor IV<br>United States District Judge |